ALLAPATTAH SERVICES,
INC., et al., Plaintiffs,

v.

EXXON CORPORATION, Defendant.

No. 91–0986–Civ–GOLD.

United States District Court,
S.D. Florida.

July 1, 1999.

Eugene E. Stearns, Stearns, Weaver, Miller, et al., Miami, Florida, Sidney M. Pertnoy, Pertnoy, Solowsky & Allen, P.A., Miami, Florida, for plaintiffs.

Larry S. Stewart, Stewart Tilghman, et al., Miami, Florida, Robert J. Brookhiser, Howrey & Simon, Washington, D.C., for defendant.

### ORDER ON EXXON'S MOTION IN LIMINE TO EXCLUDE EXTRINSIC EVIDENCE TO ESTABLISH THE ALLEGED OBLIGATION UNDER THE WRITTEN CONTRACTS

GOLD, District Judge.

THIS CAUSE is before the Court upon Exxon's Motion in Limine to Exclude Extrinsic Evidence to Establish the Alleged Obligation Under the Written Contracts [D.E. # 1024]. Exxon seeks to exclude all evidence delineating its contractual obligation with regard to setting its open price term which is not contained within the four corners of the dealers' respective Sales Agreements. Exxon's request is predicated on three grounds: (1) the evidence is inadmissible to substantiate an impermissible modification of the express terms of the Sales Agreement; (2) the evidence is inadmissible as it does not satisfy the Uniform Commercial Code's definition of extrinsic evidence of "course of dealing" and "course of performance"; and (3) the evidence is inadmissible as applied to all of the Sale Agreements on a class-wide basis.

## I. Discussion and Analysis

### A. The Underlying Policy of the Use of Extrinsic Evidence

■ Although parol or extrinsic evidence infers that admissibility is governed by rules of evidence, it is, in fact, a substantive rule of law. *See MCC–Marble Ceramic Ctr., Inc. v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384, 1388–89 (11th Cir.1998). Courts have held that the parole evidence rule is "helpful to promote *good faith* and uniformity in contract, as well as an appropriate answer to the question of how much consideration to give parol evidence." *Id.* at 1391 (emphasis added). The rule is meant to prevent a party from showing, extrinsically, "the fact itself—the fact that the terms of the agreement are other than those in the writing." *Id.* at 1389. "As such, a federal district court cannot simply apply the parol evidence rule as a procedural matter—as it might be if excluding a particular type of evidence under the Federal Rules of Evidence, which apply in federal court regardless of the source of the substantive rule of decision." *Id.* Under the Uniform Commercial Code ("UCC"), courts are instructed to liberally construe agreements in a manner that promotes modernization of law governing commercial transactions by recognizing the customs, usages and agreements common in commercial practices. *See* UCC § 1–210.

### B. Use of Parol Evidence Under the UCC

■ Section 1–102 of the UCC provides that parties may, by "agreement," determine the standards by which they will perform their contractual obligations. "Agreement" is defined as "the bargain of the parties in fact as found in their language *or by implication from other circumstances including course of dealing or usage of trade or course of performance,* as provided in Sections 1–205 and 2–208." UCC § 1–102 (emphasis added). Under the UCC, even though words and terms in a writing intended to be the final expres-

sion of the agreement of the parties may not be contradicted by evidence of a prior or contemporaneous agreement, extrinsic evidence may be used to explain or supplement the writing, in the form of course of dealing, trade usage, and "by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." UCC § 2–202. Cases applying the parol evidence rule to contracts governed by the UCC have held that the rule does not impose the supposition that, because the agreement may be a final writing as to some of the terms of an agreement, it is final as to all of its terms. *See Bob Robertson, Inc. v. Webster,* 679 S.W.2d 683 (Tex.App.—Hous. 1st Dist.1984).

■ Moreover, the contract does not only include the language used, but also encompasses the bargain of the parties as found in their language or by implication from other circumstances. *See Printing Center of Tex., Inc. v. Supermind Pub. Co., Inc.,* 669 S.W.2d 779 (Tex.App.—Hous. 14 Dist.1984). Thus, parole evidence may be used to determine whether the agreement is partially or completely integrated, as well as "to *explain* the meaning of even a fully integrated agreement." *McMahon Food Corp. v. Burger Dairy Co.,* 103 F.3d 1307, 1314 (7th Cir.1996) (emphasis added).

■ Whether the parties intended a writing to be the complete and exclusive agreement between them, requires a comparison of the writing with the parties' prior negotiations. *See id.* Consequently, whether the agreement was meant to be final as to a specific term or whether they would have been included in the agreement had the parties intended to incorporate them, is a question of fact. *See Sierra Diesel Injection Serv., Inc. v. Burroughs Corp., Inc.,* 890 F.2d 108 (9th Cir. 1989). Integration clauses do not permit parties to avoid the consequences of a breach of the implied covenant of good faith. *See Amoco Oil Co. v. Ervin,* 908 P.2d 493, 499 (Colo.1995).

## C. Use of Extrinsic Evidence to Establish Duty or Breach of Good Faith

■ The implied duty of good faith and fair dealing is most commonly raised as an issue in output and requirements contracts, wherein the price and quantity terms are left open. *See Ervin v. Amoco Oil Co.,* 885 P.2d 246 (Colo.App.1994). Whether the covenant has been breached is generally a question of fact. *See id.* at 499; *see also TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 548 (6th Cir.1981) (whether the "subject to change" provision of the contract to purchase limited seller's price increases to passing on to the buyer changes in prices charged to the seller by the manufacturer was a question for the jury in a breach of contract action); *GMAC v. Anaya,* 103 N.M. 72, 703 P.2d 169 (1985); *Vermont Morgan Corp. v. Ringer Enter., Inc.,* 92 A.D.2d 1020, 461 N.Y.S.2d 446 (1983) (there were substantial fact issues as to whether the purchases made under an open price term contract, requiring the term to be reasonable, and whether the charges were in fact reasonable, precluded summary judgment); *Landrum v. Devenport,* 616 S.W.2d 359 (Tex.App.—Texarkana 1981) (where parties signed agreement for purchase, which was complete in all respects except specification of price, and evidence was conflicting as to what the price was to be, the question of price, whether a specific or reasonable figure, was a question for the jury upon evidence); *Eglin Federal Credit Union v. Curfman,* 386 So.2d 860 (Fla. App.1980).

■ Additionally, a question of fact is raised when ascertaining the parties' intentions as to an open price term. *See TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 548 (6th Cir.1981). "Where only part of a contract has been reduced to writing, parol evidence is admissible to complete the agreement." *Weiss v. Salamone,* 116 A.D.2d 1009, 498 N.Y.S.2d 630, 631 (1986).

██ Since compliance with the obligation to act in good faith requires that the party's actions be consistent with the agreed common purpose and justified expectations of the other party, the purpose, intentions and expectations of the parties may be determined by considering the language of the contract as well as the course of dealings between and conduct of the parties. *See St. Benedict's Development Co. v. St. Benedict's Hosp.*, 811 P.2d 194 (Utah 1991) (examination of the express contract terms, alone, is insufficient to determine whether there has been a breach of the implied covenant of good faith and fair dealing).

### D.  Evidence Demonstrating Dealing, Performance and Trade Usage

██ The UCC defines "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." UCC § 1–205. "Usage of trade" refers to "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." Both course of dealing and trade usage give meaning to and supplement or qualify the terms of a written agreement.[1] However, where applying course of dealing and trade usage conflicts with an express term of a contract, the expression controls. If there is no conflict and the terms of the contract can reasonably be construed as consistent with the course of dealing and trade usage, then an interpretation can be made by taking into consideration all of the factors. *See Nanakuli Paving & Rock Co.*, 664 F.2d at 805.

██ According to the Official Comment, the determination is made by considering the language of the agreement, the actions of the parties, commercial standards, "and other surrounding circumstances." UCC § 1–205 cmt. 1. Course of dealing can only relate to conduct between the parties that preceded the formation of the contract. Nevertheless, since course of performance is another factor which may be considered, conduct after the agreement was made may be considered. *See, e.g., Trad Indus., Ltd. v. Brogan*, 246 Mont. 439, 805 P.2d 54, 58 (1991); *H.C. Schmieding Produce Co., Inc. v. Cagle*, 529 So.2d 243, 247 (Ala.1988).

The case law interpreting this section of the UCC allow for the use of extrinsic evidence, relative to trade usage and course of dealing, to explain ambiguities and omissions in the terms of a contract. *See e.g., Hedrick Sav. Bank v. Myers*, 229 N.W.2d 252 (Iowa 1975) (evidence of course of dealing is relevant to interpreting contracts under the UCC); *Hepler v. Atlas Mut. Ins. Co.*, 501 So.2d 681 (Fla. App.1987). Moreover, evidence of trade usage may be used even if no ambiguity exists in the contract. *See, e.g., A.J. Cunningham Packing Corp. v. Florence Beef Co.*, 785 F.2d 348 (1st Cir.1986); *Typographical Serv., Inc. v. Itek Corp.*, 721 F.2d 1317 (11th Cir.1983); *Morgan v. Stokely–Van Camp, Inc.*, 34 Wash.App. 801, 663 P.2d 1384 (1983) (usage of trade need not have any relationship to either party or to a contract involved in the dispute for extrinsic evidence of trade usage to be admissible).

Clarifying the trade usage which may be considered, the Official Comment states the meaning as "what it may fairly be expected to mean to parties involved in the particular commercial transaction in a given vocation or trade." UCC § 1–205 cmt. 4. There are no constraints on the amount of time the usage has been utilized by the trade, "recognition is available for new usages and for usages currently observed by the great majority of decent dealers, even

---

1. The UCC defines "course of performance" as "the action of the parties in carrying out the contract at issue." *Nanakuli Paving &* *Rock Co. v. Shell Oil Co., Inc.*, 664 F.2d 772, 794 (9th Cir.1981).

though dissidents ready to cut corners do not agree." *Id.* § 1–205 cmt. 5.

### E. Propriety of Using Extrinsic Evidence

■ As noted by Plaintiffs in their response to Exxon's motion, this is not the first time this motion has been before the Court. Judge Kehoe addressed the matter in his prior order denying Exxon's motion to exclude the same type of evidence "without prejudice to raise relevant evidentiary objections to specific items of evidence when offered by the Plaintiffs, as appropriate, at the pretrial conference or during trial." Order [D.E. # 909], at 1. At the same time, Judge Kehoe, in denying Exxon's motion for summary judgment, concluded that Article 2 of the UCC compels consideration of parol evidence to determine if a legal duty was created. *See id.* at 9–17.

While the undersigned ultimately agrees with Judge Kehoe—that I must assess, at the time of trial, whether the documents and testimony proffered by Plaintiffs as general evidence on course of dealings, course of performance, trade usage, and the general background and circumstances are properly admissible under applicable Code provisions, it is important that the parties understand the standard that this Court will apply in so ruling. Since my analysis is somewhat different from that of Judge Kehoe's, I shall endeavor to explain my reasoning.[2]

Pursuant to UCC § 1–201(3), Exxon could, by "agreement," determine the standards by which the performance of its good faith obligation was to be measured. "Agreement," under the UCC, is not limited or necessarily confined to the contract's language; rather, it has a broader meaning. Thus, the bargain of the parties in fact may be found by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in §§ 1–205 and 2–208. The Official Commentary explains

that "agreement" is intended to include full recognition of usage of trade, course of dealing, course of performance and the surrounding circumstances. UCC § 1–201(3) cmt. 3.

While, admittedly, the UCC defines course of dealings, course of performance, and usage of the trade, the particular "pigeon hole" is not necessarily controlling if the totality of the circumstances warrant the introduction of "what happened" in order to explain Exxon's good faith obligation, so long as the evidence provides a common basis for interpreting Exxon's expressions and conduct. It is of no consequence that certain items of evidence may precede or follow the execution of any one of the thousands of Sales Agreements in the dealer class from 1982 to 1994. As noted in the commentary following UCC § 1–205, "the provisions of the. Act on course of performance make it clear that a sequence of conduct after or under the agreement may have equivalent meaning." UCC § 1–201 cmt. 2.

This flexibility is consistent with the general rule of construction that "the Act shall be liberally construed and applied to promote its underlying purposes and policies." UCC § 1–102(1). The UCC itself recognizes that special consideration must be given to where one party is empowered to set particular contract terms, such an open price term, and where that discretion must necessarily reflect the circumstances in effect at the time it is exercised. According to § 2–311(1), where the contract leaves the particulars of performance to be specified by one of the parties, such specification must be made in good faith and within limits set by commercial reasonableness. "Good faith" and "commercial reasonableness" is necessary "so that there is no surprise and the range of permissible variation is limited by what is commercially reasonable." UCC § 2–311 cmt. 1. Further, "[t]he 'agreement' which permits one party so to specify may be

---

**2.** This order should be considered in conjunction with the Order Denying Exxon's Renewed Motion for Summary Judgment on Count I.

found as well in a course of dealing, usage of trade, or implication from circumstances as in explicit language used by the parties." *Id.*

Exxon's "agreement" as to the standard for measuring its duty of good faith performance may be found by implication from all of the surrounding circumstances, including, but not limited to, course of dealing, course of performance, and the like. Regarding "course of dealing," Exxon's adoption and implementation of the DFC program, the unilateral amendment of its dealers' credit card agreements, its official public explanation of its performance obligation and its claimed history of meeting its performance obligations to its dealers, appear to be relevant evidence of Exxon's adoption of standards by implication as to how it was to set open prices under each then existing or new Sales Agreement during the duration of the DFC program.

Moreover, in considering "course of performance" to the proffered facts of this case, it is significant that all Sales Agreements at issue involved repeated occasions for performance by Exxon (i.e. setting the open price for each delivery), subject to its obligation of good faith. Given that **only** Exxon knew, or reasonably could have known, whether it had adhered to its own adopted standard of good faith performance, all evidence relevant to that determination would appear to be admissible. Likewise, the converse is also relevant; that is, whether the dealers reasonably could have known whether or how Exxon was carrying out the "unbundling" so as to accept, acquiesce or object to Exxon's setting of the open price term.

Accordingly, I concur with Judge Kehoe's conclusion that: "Consideration of

the extrinsic evidence in this case invites the antithesis of individualized proof." Order on Summary Judgment, at 12. To paraphrase, Judge Kehoe's consideration of Exxon's good faith duty, according to the standard it established, necessarily involves system-wide proof regarding system-wide credit and pricing practices. This would encompass twelve years of Exxon's own conduct, which includes words, deeds, writings, and actual and purported performance concerning how Exxon carried out its good faith performance obligation. For this reason, I disagree with Exxon's argument that such evidence is not "uniform" as to each dealer. Rather, the proffered evidence as to how Exxon was to carry out its good faith duty applies equally to all dealers, since all dealers were entitled to the same "on average" benefit, regardless of whether they individually received a dollar for dollar set off at all times within the twelve-year period of the DFC program.

Moreover, I concur with Judge Kehoe's conclusion, although for different reasons, that such evidence would not be barred under UCC § 2–202. Simply put, Exxon's good faith obligation in each Sales Agreement may be explained or supplemented by course of dealing, usage of trade, or course of performance, as well as such other evidence which explains Exxon's good faith obligation. Such evidence does not modify or contradict the express terms of the contract, and is not inconsistent with the express terms of any agreement, because each Sales Agreement expressly includes a "good faith" obligation. In any event, the UCC implies that one is included. *See* UCC § 2–202 [3]; *see also McDermott, Inc. v. Iron,* 979 F.2d 1068, 1075 (5th

---

**3.** The Commentary to this section states that admissible evidence includes:

course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties

nd the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean.

UCC § 2–202 cmt. 2.

Cir.1992) ("These changes did not modify the contract; they were contemplated by the parties, and the parties specifically provided for them in the contract."). Significantly, an integration clause does not permit parties to avoid the consequences of a breach of the implied covenant of good faith. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 499 (Colo.1995).

## II. Summary

█ Extrinsic evidence which explains the agreement and Exxon's good faith obligations is admissible. "[T]he test of admissibility is not whether the contract appears on its face to be complete in every detail, but whether the proffered evidence of course of dealing [, course of performance] and trade usage reasonably can be construed as consistent with the express terms of the agreement." *Nanakuli Paving & Rock Co.*, 664 F.2d at 796 (quoting source omitted).

█ Cases cited by the parties indicate that extrinsic evidence also will be used to determine whether the good faith obligation had been breached. For example, in *Ervin*, the court considered evidence that Amoco had not been duplicating the charges to its dealers, but actually set its wholesale prices to offset the amount of the credit card processing charge. In *East Bay Running Store, Inc. v. NIKE, Inc.*, 890 F.2d 996, 1000 (7th Cir.1989), the court had to use extrinsic evidence to determine that "the implementation of [Nike's] policy does not appear to be an underhanded attempt on the part of Nike to drive any individual dealer out of business." Here, both of these allegations are at issue. Plaintiffs contend that Exxon was double charging them for the cost of credit card processing, and allege that Exxon's purpose was partly to drive unproductive dealers out of business, in violation of federal law. It is possible for a jury to conclude that, should these allegations be proven, Exxon breached its duty of good faith.

Moreover, extrinsic evidence may be offered to show that the offset arrangement Exxon implemented with its dealers was common in the trade. Oil companies' DFCs were the result of the enactment of the Cash Discount Act, passed by Congress on July 27, 1981. The Act prohibited retailers from placing a surcharge on credit sales, while permitting an unlimited discount to cash purchasers. Thus, commencing in 1982, several major U.S. oil companies implemented the DFC. Evidence as to whether these other companies charged twice for the recovery of credit card processing is relevant to ascertain the appropriate usage in the trade of the DFC offsetting mechanism.

In sum, the UCC's rules governing admissibility of evidence "allows the jury to take into account consistent parol evidence when it attempts to discern the meaning of a written contract." *Sundlun v. Shoemaker*, 421 Pa.Super. 353, 617 A.2d 1330, 1334 (1992). "The law has nothing to do with the actual state of the parties' minds. In contract, as elsewhere, it must go by externals, and judge parties by their conduct." *MCC–Marble Ceramic Ctr., Inc.*, 144 F.3d at 1387 n. 8 (quoting Oliver W. Holmes, *The Common Law* 242 (Howe ed, 1963)).

█ In the instant action, Plaintiffs allege that oral statements were made and written representations were disseminated by Exxon in the course of dealing. Exxon even admits that it did, at least for a period of time, deduct the credit card processing fee from its wholesale prices to dealers, thus, establishing a course of performance. "Unless carefully negated by the written terms of the contract, the parties' course of dealing [and course of performance], including any inconsistent oral representations, become an element of the meaning of the words used." *Sundlun*, 617 A.2d at 1334. Additionally, Plaintiffs may explain the meaning and understanding of the agreement, regarding the open price term, with evidence showing that a course of performance resulting in acquiescence, was meant to be incorporated into the written terms of the Sales Agreement. *See Nanakuli Paving & Rock Co.*, 664

F.2d at 795. "[T]he use of such evidence 'simply places the court in the position of the parties when they made the contract, and enables it to appreciate the force of the words they used in reducing it to writing.'" *Id.* at 798 (quoting *Chase Manhattan Bank v. First Marion Bank,* 437 F.2d 1040, 1048 (5th Cir.1971)).

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that Exxon's Motion in Limine to Exclude Extrinsic Evidence to Establish the Alleged Obligation Under the Written Contracts [D.E. # 1024] is DENIED.